```
                                                          D+ F

                                                          c/f
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA                :
                                        :               04-CR-673 (ERK)
         -against-                      :
                                        :               **CORRECTED**
PATRICK RYAN, et al.,                   :               **MEMORANDUM & ORDER**
                                        :
              Defendants.               :
                                        :
----------------------------------------------------------X
```

KORMAN, Chief Judge.

Eleven passengers died, and dozens of others were injured, when the Staten Island Ferry Service (the "Ferry") vessel *Andrew J. Barberi* (the "*Barberi*") collided into the St. George terminal on October 15, 2003 (the "Collision"). The Collision occurred after Assistant Captain Richard Smith, who had been piloting the vessel, suddenly became incapacitated. No crew member was aware of Smith's incapacitation and able to respond in order to prevent the crash. Ferry Captain Michael Gansas was on board the vessel, but was not in the operating pilothouse when Assistant Captain Smith became disabled.

At the time of the collision, defendant Patrick Ryan was the Director of Ferry Operations (the "Director"). The Indictment charges that Ryan was "responsible for fulfilling the Ferry's duty to ensure the safety of its passengers during every voyage on the [r]oute." (Indictment ¶ 10). This responsibility included "ensuring ... against the hazard of a pilot's sudden disability." (Id.). More specifically, the Indictment charges that Ryan should have enforced the so-called "two-pilot rule," which requires both the captain and assistant captain to be in the operating pilothouse while the ferry is underway. (Indictment ¶12). The Indictment alleges that in 2001, during Ryan's second term as

1

Director, Ryan drafted a document titled "Standard Operating Procedures for Captains, Assistant Captains, Mates, Deckhands and Female Attendants While the Boats Are Loading, Off Loading and Underway" (the "2002 SOP"). (Indictment ¶ 16). Had it been implemented, the 2002 SOP would have required each ferry's captain and assistant captain to be in the operating pilothouse while the ferry was in operation. (Id.). However, Ryan never implemented the 2002 SOP. (Indictment ¶ 17). Although he provided the 2002 SOP to a DOT administrator and the Coast Guard as part of a proposed security plan, Ryan did not take steps to ensure that the document was distributed to Ferry personnel including captains and assistant captains. (Id.)

Ryan is also charged with failing in his responsibility to ensure passenger safety by not promulgating and enforcing rules relating to passenger safety, and by not training Ferry personnel on safety measures in the event of a pilot's sudden disability. (Indictment ¶ 18). The Indictment charges that "[a]s a result, as of [the date of the Collision], the Ferry operated without centrally promulgated and uniform rules, procedures or practices either to guard against the serious hazard of the sudden disability of the pilot or to instruct the Ferry's personnel on the appropriate actions to ensure the safety of the passengers in the event of a pilot's sudden disability." (Indictment ¶ 19). Specifically, it alleges that: (1) captains and assistant captains were not always together in the operating pilothouse during routes; (2) on the night shift, some captains and assistant captains split shifts such that only one piloted the vessel in both directions while the other did not navigate and sometimes slept; and (3) deckhands with assignments in the operating pilothouses were not trained on actions to be taken to guard against the hazard of the sudden disability of the pilot. (Id.).

## DISCUSSION

Ryan has moved to dismiss Counts 1-11 of the Indictment, which charge him with

2

committing criminal neglect that caused the Collision and the resultant eleven deaths. Specifically, these Counts charge Ryan with violating 18 U.S.C. § 1115, a section titled "Misconduct or neglect of ship officers." This section is more often referred to as the "Seaman's Manslaughter Statute" (the "Statute"). The name derives from the use of the word "manslaughter" to describe the offense when the Statute was first enacted in 1838. Although the word was subsequently deleted, the manner in which the Statute is described has not changed. The product of any number of amendments and revisions since its enactment, it now reads as follows:

> Every captain, engineer, pilot or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector or other public officer, through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.
>
> When the owner or charter of any steamboat or vessel is a corporation, any executive officer of such corporation, for the time being actually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel, who had knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.

The Statute provides different standards of liability depending on whether the defendant was (1) a person employed on the vessel; (2) an owner, charterer, inspector or "other public officer;" or (3) an "executive officer" of a corporation charged with the control and management of the vessel. The Indictment charges Ryan under the latter two standards, as both a "public officer" and as an "executive officer." If Ryan is a public officer, the United States Attorney need only prove that his "fraud, neglect, connivance, misconduct, or violation of law" caused the Collision. The relevant word here is neglect – a standard which the United States Attorney understands to be the same required for a plaintiff to prevail in a negligence case. On the other hand, if Ryan is an executive officer, the United States Attorney must prove that he "knowingly and willfully caused and allowed

3

such fraud, neglect, connivance, misconduct, or violation of law" which caused the Collision. Again, the relevant word is neglect, although the degree of negligence is considerably greater than the standard necessary for a plaintiff to prevail in a negligence case.

The significance of the distinction here is illustrated by the reason given by the United States Attorney for her insistence on charging Ryan both as a public officer and as an executive officer. The United States Attorney intends to show that: (1) Ryan was aware of the necessity for having two pilots in the pilothouse to protect against the precise disaster that occurred in this case; (2) Ryan knew that the rule was neither disseminated nor enforced; and (3) that, notwithstanding such knowledge, he consciously made no effort to do so. Nevertheless, the United States Attorney believes that Ryan may testify that he took steps to ensure that the rule was disseminated and followed and that, at worst, the steps that he took were inadequate – making five copies of the 2002 SOP and placing them in separate envelopes in the Ferry's port office, with the expectation that they would be placed in the ferry pilothouses. If credited by a jury, the United States Attorney fears this testimony could provide a defense to a charge of knowing and willful neglect by an executive officer, although she argues it would not provide a defense to a charge of simple negligence, which is the critical element of the defendant's liability if he was a public officer.

The position of the United States Attorney comes down to this: If the *Barberi* had been owned by a private, as opposed to a municipal corporation, Ryan's criminal liability would derive solely from his status as an executive officer, who may be convicted if the neglect that caused the deaths of eleven passengers was knowing and willful. On the other hand, if he performed the same function for a municipal corporation, he may be convicted without any showing that his negligence was knowing and willful. This result is wholly irrational. See, e.g., United States v. Granderson, 511 U.S. 39, 45-47 & nn.4-5 (1994) (refusing to accept construction of statute that would provide

more favorable treatment for drug-possessing probationers than other probation-violating individuals).

Rather than defend the rationality of this distinction, the United States Attorney argues generally that it is not uncommon for Congress to treat public officials differently than private persons similarly situated. Specifically, she cites 18 U.S.C. § 201(b)(2), which criminalizes corruption involving "a public official or person selected to be a public official," and the Hobbs Act, 18 U.S.C. § 1951, which criminalizes extortion "under color of official right," a crime that is comparable to bribery, although it is not necessary here to discuss the subtle distinction between the two. This argument ignores the evil sought to be proscribed by the corrupt use of public office. As the Second Circuit has observed:

> [t]he evil sought to be prevented by the deterrent effect of 18 U.S.C. § 201(b) is the aftermath suffered by the public when an official is corrupted and thereby perfidiously fails to perform his public service and duty. Thus the purpose of the statute is to discourage one from seeking an advantage by attempting to influence a public official to depart from conduct deemed essential to the public interest. As Judge Hastie aptly stated in United States v. Labovitz, 251 F.2d 393, 394 (3[d] Cir. 1958):
>
>> It is a major concern of organized society that the community have the benefit of objective evaluation and unbiased judgment on the part of those who participate in the making of official decisions. Therefore, society deals sternly with bribery which would substitute the will of an interested person for the judgment of a public official as the controlling factor in official decision.

United States v. Jacobs, 431 F.2d 754, 759 (2d Cir. 1970). This evil is simply not present in cases of commercial bribery, although such conduct is proscribed specifically by, or comes within the ambit of, other statutes. See, e.g., 18 U.S.C. §§ 212, 215, 224, 1341. The fact that Congress may sometimes treat official misconduct and private misconduct differently hardly supports the irrational distinction at issue here.

The United States Attorney also argues that Ryan's position fits within the plain language definition of the statute. While the word "public" may have a plain meaning, the word "officer" is quite another matter. In discussing the definition of "public officer," a New York State Supreme Court Justice once observed aptly:

> It is not always easy to define the term "public officer" so as to have a definition that will apply and point out the distinction in every case. In general whether either the People or the Legislature create an office or designate a person to perform some function of government, the head of such an office would be a public officer; whereas, if the head of such an office delegates part of his work to a number of persons employed to carry out the details of the work we think the persons so appointed would, generally speaking, be holders of positions. The line between a public officer and a public employment has not been too clearly marked by judicial expression probably because the distinction is not too clear. The holder of a public office is in the employment of the public, but all those who are in the public employment are not public officials and do not hold public office.

Sweeney v. Donovan, 1 Misc. 2d 125, 128 (N.Y. Sup. Ct. 1955).

Other New York cases define "a public officer, in contrast to a subordinate public employee" as "a person whose position is created, and whose powers and duties are prescribed, by statute and who exercises a high degree of initiative and independent judgment" and "[t]he creation and filling of the position must be mandatory." Lake v. Binghamton Hous. Auth., 130 A.D.2d 913, 914 (N.Y. App. Div. 1987) (citations omitted) (holding that "executive director" of Binghamton Housing Authority was not public officer because public housing law "neither prescribes the duties and powers of a secretary/executive director nor does it mandate the creation or filling of that position."). Indeed,

> [w]hether a particular person is an independent officer or a subordinate employee is not always an easy matter to determine. No automatic rule ... is at hand ... The decisions do, however, contain certain guides and, if we were to attempt a formulization, it would be this – he is an independent officer whose position is created, and whose powers and duties are prescribed, by statute and who exercises a high degree of initiative and independent judgment.

6

O'Day v. Yeager, 308 N.Y. 580, 586 (N.Y. 1955) (citations and quotation marks omitted)); see also Haller v. Carlson, 42 A.D.2d 829 (N.Y. Sup. Ct. 1943). While Congress may have intended a uniform definition of the term, in the absence of any clear indication of what definition Congress had in mind, surely the definition of the term by the jurisdiction of which the defendant is said to be a public officer is not altogether irrelevant. More significantly, New York law is consistent with the specific definition of "public officer" set out in the Dictionary Act, which defines "officer" as including "any person authorized by law to perform the duties of the office." 1 U.S.C. § 1. Indeed, in United States v. Hartwell, 73 U.S. 385 (1867), decided before the enactment of the Dictionary Act, the Supreme Court held that a clerk in the office of the Assistant Treasurer of the United States whose position and appointment were specifically authorized by statute was, for this and related reasons, a public officer. Id. at 393-94. Similarly, in Hoeppel v. United States, 85 F.2d 237 (D.C. Cir. 1936), the Court of Appeals held that a West Point Cadet is an officer of the United States because Congress expressly provided for his appointment by the President. Id. at 241-42.

Turning specifically to this case, the New York City Charter confers on the Commissioner of Transportation responsibility for maintaining and operating all of the ferries of City. NYC Charter § 2903. The Charter does not specifically mention Ryan's position, that of Director of Ferry Operations, and merely authorizes the Commissioner to appoint three "deputies." Id. at § 2902. Moreover, the only mention of a position somewhat similar to the one held by Ryan appears in the New York City Rules. The section on ferry terminals and vessels defines "Manager[s]" as both ferry captains and "Ferry Terminal Supervisor[s]." 34 R.C.N.Y. § 1-01. The rules require that "[e]ach terminal will have a different Manager." (Id.). Ryan did not hold that position.

Ryan's position does not fit within the specific definition of a "public officer" because it is not created by statute, nor are the duties of the position defined by law. Indeed, the United States

Attorney acknowledges that she "is not aware of any provision of law specifically identifying the position of director of municipal ferry operations" (Letter of April 19, 2005 in Response to the Court's Order of April 13, 2005). While she makes an argument – that consumes four pages of her single-spaced letter – to fit Ryan's position into the definition, the effort only highlights the fact that the Statute is not amenable to a literal interpretation. Indeed, the Supreme Court has acknowledged that the meaning of the term "public officer" turns Congress's intent when using the term. So, for example, after employing a formal definition of the term in the case before it, the Supreme Court observed :

> Undoubtedly congress may have used the word 'officer' in some other connections in a more popular sense ... in which case it will be the duty of the court in construing such an act of congress to ascertain its true meaning, and be governed accordingly.

United States v. Mouat, 124 U.S. 303, 308 (1888). I undertake that exercise shortly. Before doing so, I add that even if Congress intended the term "public officer" to include positions other than the kind specifically defined in the Dictionary Act, it failed to delineate what those other positions might be. We may assume that, if Congress intended the term to include every public officer or employee, it would have said so. See, e.g., 18 U.S.C. §1114 (2000) ("Whoever kills or attempts to kill any officer or employee of the United States ..."); see also 18 U.S.C. §217 (2000) ("Whoever, being an officer or employee of, or person acting for the United States ..."); cf. H.R. 746 38th Cong. (1865) (amending previous steamship regulation and specifying intent to regulate "any person, except" certain specified officers). Because of Congress's silence, the term should be construed in a way that "fits most logically and comfortably into the body" of the Seaman's Manslaughter Statute. See West Virginia Univ. Hosp. v. Casey, 499 U.S. 83, 100-01 (1991) (Scalia, J.). As the Supreme Court held in the foregoing case:

> Where a statutory term presented to us for the first time is ambiguous, we construe

8

> it to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law. We do so not because that precise accommodative meaning is what the lawmakers must have had in mind (how could an earlier Congress know what a later Congress would enact?), but because it is our role to make sense rather than nonsense out of the *corpus juris*.

Id. (internal citation omitted).

The inconsistency in treatment of public officers and executive officers is likely due to the fact that they were added to the list of those subject to criminal liability at different times and in response to different events. Some background is required. Congress began legislating in this area in the nineteenth century. The legislation was prompted by the significant loss of life on steamboats due to boiler explosions. At the time, the steamboats were privately owned and operated. David John Denault, An Economic Analysis of Steam Boiler Explosions in the Nineteenth-Century United States 47 (1993) (unpublished Ph.D. dissertation, Indiana University) (on file with University of Connecticut Library). Indeed, the operation of steamboats by limited liability corporations was not common until the latter part of the nineteenth century. Id. at 55, 125-26; Richard N. Langlois et al., Bursting Boilers and the Federal Power Redux: The Evolution of Safety on the Western Rivers 16. (University of Connecticut Department of Economics Working Paper Series No. 1994-01, 1994) (available at http://econwpa.wustl.edu:8089/eps/eh/papers/9503/9503002.pdf).

Congress adopted the Seaman's Manslaughter Statute in 1838, as part of "[a]n Act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam," Act of July 7, 1838, ch. 191, 5 Stat. 304 (1838). The 1838 Act "incorporated several sections relating to the prevention of collisions, the control of fires, the inspection of hulls, and the carrying of lifeboats." John G. Burke, Bursting Boilers and the Federal Power, in Technology & American History 119 (Stephen H. Cutcliffe and Terry S. Reynolds eds., 1997). It set forth duties for "the collector or surveyor of the port," and authorized district judges to appoint inspectors of "the

boilers and machinery" and "the hull of any steamboat or vessel." Act of July 7, 1838, ch 191, 5 Stat. 304 (1838).

> The inspector was to examine every steamboat boiler in his area semiannually, ascertain its age and soundness, and certify it with a recommended working pressure. For this service the owner paid the inspector $5.00 – his sole remuneration – and a license to navigate was contingent upon the receipt of this certificate. The law specified no inspection criteria. It enjoined the owners to employ a sufficient number of competent and experienced engineers, holding the owners responsible for loss of life or property damage in the event of a boiler explosion for their failure to do so.

Burke, supra, at 119. The 1838 Act also criminalized the negligent conduct of "every captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam." Act of July 7, 1838, ch 191, 5 Stat. 304 (1838). The 1838 Act failed in its purpose because the regulatory scheme was particularly inadequate. As Professor John G. Burke explained:

> Experience proved that the 1838 law was not preventing explosions or loss of life. In the period 1841-48, there were some seventy marine explosions that killed about 625 persons. In December 1848 the commissioner of patents, to whom Congress now turned for data, estimated that in the period 1816-48 a total of 233 steamboat explosions had occurred in which 2,563 persons had been killed and 2,097 injured, with property losses in excess of $3 million.
>
> In addition to the former complaints about the lack of proof tests and licenses for engineers, the commissioner's report included testimony that the inspection methods were a mockery. Unqualified inspectors were being appointed by district judges through the agency of highly placed friends. The inspectors regarded the position as a lifetime office. Few even looked at the boilers but merely collected their fees. The inspector at New York City complained that his strict inspection caused many boats to go elsewhere for inspections. He cited the case of the "Niagara," plying between New York City and Albany, whose master declined to take out a certificate from his office because it recommended a working pressure of only 25 p.s.i. on the boiler. A few months later the boiler of the "Niagara," which had been certified in northern New York, exploded while carrying a pressure of 44 p.s.i. and killed two persons.

Burke, supra, at 122; see also Gregory P. Sandukas, Gently Down the Stream: How Exploding Steamboat Boilers in the 19th Century Ignited Federal Public Welfare Regulation 31-36 (2002)

(available at http://leda.law.harvard.edu/leda/data/530/Sandukas_redacted.pdf). Moreover, the Seaman's Manslaughter Statute was generally unenforceable, because "[j]uries cannot be induced to subject a man to the penalties of manslaughter for an act of negligence to which they find it impossible to attach the degree of guilt which so severe a sentence would seem to imply." House Executive Doc. 18 (1848) Serial 529, p. 29, quoted in Denault, supra, at 140-141.

In 1852, Congress enacted more comprehensive steamboat safety regulation that specifically prescribed standards for the construction and design of boilers, empowered inspectors to authorize repairs at any time, provided for the licensing of steamboat engineers and the issuance of certificates of vessel seaworthiness. Act of August 30, 1852, ch. 106, 10 Stat. 61 (1852). Inspectors falsifying certificates were subject to a five hundred dollar fine, and the law expressly prohibited them from accepting bribes. Id.; Burke, supra, at 124. The 1852 Act also established various duties for "the collector or other chief officer of the customs," created the positions of "nine supervising inspectors" for the various districts, and authorized these two groups of officers, along with district court judges, to appoint various "inspector of hulls" and "inspector of boilers." Act of August 30, 1852, ch. 106, 10 Stat. 61 (1852). The Act also created a board of inspectors, along with several local boards of inspectors within the districts. Id.; see also Burke, supra, at 124 (describing the roles of these various inspectors).

Up until this point, public officers were not subject to criminal liability under the Statute. Id. Congress added public officers to the list of those subject to criminal prosecution under the Statute in 1864, near the end of the Civil War – a period when the otherwise effective enforcement of the 1852 Act had lapsed. See Act of July 4, 1864, ch. 249, sec. 6, 13 Stat. 390, 391 (1864). This "was a particularly dismal period for steamboat accidents." Sandukas, supra, at 45. Indeed, the period ended with "one of the greatest of all disasters, the destruction of the passenger vessel *Sultana*

by explosion and fire with a loss of life estimated at more than 1500 lives in April 1865, [which] led to renewed legislation efforts." H.R. Rep. No. 98-338, at 137 (1983). No inspection had been made prior to the *Sultana*'s departure on its fatal voyage to determine her carrying capacity or condition. See. Jerry O. Potter, Sultana: A Tragic Postscript, originally printed in American History magazine and available at http://www.historynet.com/ah/bltragicpostscript/index.htm (noting that although as many as 1,700 died on board the *Sultana*, the vessel had a legal carrying capacity of 376).

In 1871, the renewed legislation efforts sparked by the *Sultana* disaster "culminated with legislation that combined a number of new requirements into a coherent and unified body of maritime safety laws." H.R. Rep. No. 98-338, at 137 (1983). The 1871 Act created a supervising inspector-general office, and authorized the Secretary of the Treasury to pay out of the revenues received from the licensing and inspection requirements established under the Act, "the salaries of all supervising inspectors, local inspectors, assistant inspectors, supervising inspector-general, and clerks." Act of February 28, 1871, ch. 100, sec. 57, 16 Stat. 440 (1871). Part of this complete revision of the steamboat regulatory scheme, which also established the Steamboat Inspection Service, added "inspector" to the list of persons who could be prosecuted under the Statute, so that the relevant language of the Statute criminalized the "fraud, connivance, misconduct, or violation of law by any owner or inspector, or other public officer." Act of February 28, 1871, ch. 100, sec. 57, 16 Stat. 440 (1871).

In 1905, the term "neglect" was added to the list of culpable acts for which public officers could be prosecuted. At the same time, executive officers of corporate-owned steamboats were subjected to liability for "knowingly and willfully" causing or allowing "fraud, neglect, connivance, misconduct or violation of law." See Act of March 3, 1905, ch. 1455, 33 Stat. 1023 (1905). The change was part of an amendment to the Seaman's Manslaughter Statute that was enacted in

12

response to the *General Slocum* disaster that killed over 1,000 people and which was attributed in part to the neglect of senior officers of the corporate owner. H.R. Rep. No. 4407, at 1-2 (1905). The focus was on privately-owned corporations, such as the corporate-owner of the *General Slocum*. The knowing and willful negligence required for such criminal liability reflects Congress's considered judgment of the circumstances under which such shoreside corporate officers should be subject to prosecution. Ryan's position here is comparable to these private corporate officers.

The foregoing history suggests that the way to accommodate the various amendments to the Statute is to construe the term "public officer" to cover the officers Congress had in mind when, in 1864, it added them to the list of those subject to prosecution for the misconduct. Because steamboats and other vessels were then privately owned and operated, the "public officers" were obviously officers of the United States involved in the enforcement of the legislative scheme. This accommodation treats executive officers of municipal corporations in the same way as corporate officers of private corporations.

In sum, the defendant is not the public officer Congress had in mind when it added the term to the list of those subject to criminal liability for neglect under the Seaman's Manslaughter Statute. More significantly, including him within the term would create an absurd result, and make "nonsense out of the *out of the corpus juris*." See West Virginia Univ. Hosp., 499 U.S. at 100-01. Instead, the term "public officer" should be construed "to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law." (Id.). Construing the Statute in this way necessarily excludes the defendant from the definition of "public officer."

Ryan has also challenged his status as an "executive officer," and has moved to dismiss Counts 1-11 on this ground. I have already advised the parties informally that I intend to submit to

the jury the executive officer charge, along with an aider and abettor charge under 18 U.S.C. § 2(b), which provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Under this section, regardless of his status as either an executive or public officer, Ryan could be liable for knowingly and willfully causing or allowing the negligence that resulted in the deaths of eleven passengers on the *Barberi*. Because I believe the section 2(b) charge appropriate, and because such a charge would be sufficiently similar to an executive officer charge, I need not decide Ryan's motion to dismiss the charges based on his status as an executive officer – a motion which I would otherwise be inclined to deny.

Dated: April 22, 2005
Corrected: April 25, 2005
Brooklyn, New York

Edward R. Korman
United States District Judge